IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-00350-01-CR-W-SOW |
| ) | |
| MELVIN BLACKMON, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant's Motion to Suppress Evidence (doc #20). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On November 18, 2009, the Grand Jury returned a one count indictment against defendant Melvin Blackmon. The indictment charges that on October 27, 2009, defendant Blackmon took by force, violence and intimidation approximately $2,400.00 from the Bank Midwest, 1111 Main Street, Kansas City, Missouri.

On April 13, 2010, the undersigned conducted an evidentiary hearing on defendant's motion to suppress. Defendant Blackmon was represented by Assistant Federal Public Defender William J. Raymond. The Government was represented by Assistant United States Attorney David A. Barnes. The Government called Officers Jason Grizzoffi and Robert Moore of the Kansas City, Missouri Police Department as witnesses. The defense called no witnesses to testify.

II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On October 27, 2009, at approximately 4:30 p.m., Officer Grizzoffi and his partner, Officer Moore, were dispatched to 4016 East 56 Terrace, an apartment complex, on a report of a disturbance by a Maurice Blackmon (the name given on air) who was in violation of an order of protection and believed to be high on PCP. (Tr. at 4-5, 12-13, 36-37) Prior to the officers' arrival at the scene, the officers received an update from dispatch which stated that the papers were served on Blackmon the previous

Friday. (Tr. at 6, 37) When the officers arrived at the scene, two or three people were standing outside the apartment building. (Tr. at 6, 17-18) The officers asked if they had seen anything. (Tr. at 17) The officers were advised that there was a black male dressed in all black who was not looking right, that is he appeared to be high on something and out of control. (Tr. at 6, 12, 18, 52) Officer Grizzoffi broadcast the description of the party over his police radio and asked for any cars in the area to be on the look-out for the party. (Tr. at 6-7)

2. Officer Moore started knocking on doors in the 4016 building to see who had called in the disturbance. (Tr. at 18, 37, 52) Officer Grizzoffi did a quick scan of the area to see what was going on. (Tr. at 12, 18) As he turned a corner to look down into a courtyard, Officer Grizzoffi observed a black male wearing all black. (Tr. at 7) Officer Grizzoffi attempted to make verbal contact with the party by calling out the name Maurice, the name the officers had been given by dispatch. (Tr. at 7) The person, later identified as defendant Blackmon, turned and appeared to Officer Grizzoffi to be high on something. (Tr. at 7) Blackmon looked off in the distance and did not respond to the officer's verbal commands. (Tr. at 7) Officer Grizzoffi testified that he ordered Blackmon by taser point to get down on the ground numerous times, but Blackmon did not respond in any way, he just looked extremely confused. (Tr. at 7) Officer Grizzoffi testified that he has encountered people high on PCP dozens of time in the field. (Tr. at 8) The characteristics of people high on PCP that Officer Grizzoffi has observed are that they appear confused, they stare off in the distance and they do not respond to any kind of verbal contact. (Tr. at 9) Based on Blackmon's appearance and actions, both Officer Grizzoffi and Officer Moore believed he was under the influence of PCP. (Tr. at 8, 40)

3. Officer Grizzoffi was concerned that there was going to be a fight based on the fact that defendant Blackmon was not responding whatsoever to verbal commands. (Tr. at 9) Blackmon started to reach into his pockets and Officer Grizzoffi was concerned that he might be grabbing for a weapon. (Tr. at 22-23, 32) After about twenty commands from Officers Grizzoffi and Moore to get on the ground, Blackmon started to go down, but then he came back up with his fists up as if to fight. (Tr. at 10, 55, 65) Officer Moore testified that officers have to take all precautions when dealing with someone on PCP because subjects can go from being incoherent to having super-human strength in a matter of seconds. (Tr. at 65) Officer Moore had his firearm drawn. (Tr. at 54) Officer Grizzoffi deployed his taser three times. (Tr. at 10, 24) The taser had no effect on Blackmon. (Tr. at 10, 24, 41) Officer Moore testified that he thought because Blackmon was on PCP, he did not feel the taser. (Tr. at 41) On the third charge, Blackmon exposed his back and Officer Grizzoffi tackled him to get him into custody. (Tr. at 10, 24, 38, 57) Both Officer Grizzoffi and Officer Moore wrestled with Blackmon. (Tr. at 38) As Officer Grizzoffi knocked Blackmon down, he received a residual shock from getting caught up in the cables of the taser. (Tr. at 11, 41) Blackmon was handcuffed and taken into custody. (Tr. at 11, 24, 58) Both Officer Grizzoffi and Officer Moore testified that Blackmon never said a word throughout the whole ordeal. (Tr. at 24-25, 55-56)

4. The officers called for assistance. (Tr. at 25) Whenever a taser is deployed, the policy and procedure is for the officers to call a supervisor and have medical respond to make sure everyone is okay. (Tr. at 25)

5. The officers observed More cigarettes around the area where defendant Blackmon fell down. (Tr. at 11, 41) Officer Grizzoffi testified that based on his training and

experience, he knows that More cigarettes are usually the type of cigarettes used to be dipped in PCP and smoked. (Tr. at 11) Officer Moore testified that the cigarettes looked like they had been dipped. (Tr. at 41) Other items recovered from Blackmon's person included a cough syrup bottle containing a brown liquid, five or six More cigarettes, one being wet, and a large amount of currency ($1,729.13), $1,700.00 in $100 bills. (Tr. at 11, 42, 58) Officer Moore testified that the packaging of a liquid material in a cough syrup bottle is consistent with his training and experience of how PCP is packaged. (Tr. at 42)

6. The officers located the person who called in the disturbance and were advised that a copy of the order of protection was being kept in the front office of the apartment complex. (Tr. at 28, 60) Officer Grizzoffi walked to the office and obtained a copy of the order of protection. (Tr. at 28) Officer Moore testified that the order of protection appeared to him to be in order. (Tr. at 42) The order of protection was for Sherry Pulluaim and her son. (Tr. at 60-61) Ms. Pulluaim was not present, but her son was in the apartment that defendant Blackmon walked in and out of. (Tr. at 61-62) Ms. Pulluaim instructed her 13-year-old daughter to call the police. (Tr. at 60)

7. Defendant Blackmon was placed under arrest for violating the order of protection, for resisting arrest and for drug possession. (Tr. at 30, 64)

8. Defendant Blackmon was taken to the hospital and treated for PCP and for being tased. (Tr. at 29) Blackmon was then transported to police headquarters. (Tr. at 30) While Officer Grizzoffi was taking Blackmon upstairs to the detention unit, a detention unit supervisor told Grizzoffi that Blackmon looked like the party involved in a bank robbery earlier that day. (Tr. at 30-31) Officer Grizzoffi testified that they showed him a surveillance shot taken at the bank and it was Blackmon, same clothing, same hair. (Tr. at 30-31)

9. Officer Grizzoffi testified that prior to being dispatched to 4016 East 56 Terrace on the disturbance report, he had received no information about any suspects or any descriptions of suspects involved in a bank robbery that had taken place earlier that day. (Tr. at 15, 34)

## III. DISCUSSION

Defendant Blackmon seeks to suppress all evidence obtained during the execution of the stop and arrest of defendant along with any statements made[1] as a result of the unconstitutional stop and arrest. (Motion to Suppress Evidence at 1) In support of his motion, defendant argues that the police illegally seized him without sufficient reasonable suspicion that he was doing anything illegal. (Id. at 5) Further, the officers lacked probable cause to arrest defendant. (Id.) Finally, after

---

[1] The only evidence presented at the hearing with respect to statements was that defendant Blackmon never said a word throughout the whole ordeal. (See Fact No. 3, supra)

3

arresting defendant, the officers searched him and seized his clothes, money and possessions without a warrant. (Id.)

Both investigative stops and arrests are seizures. However, an investigative stop need only be supported by a reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause. See Terry v. Ohio, 392 U.S. 1, 25-31 (1968); United States v. Raino, 980 F.2d 1148, 1149 (8th Cir. 1992), cert. denied, 507 U.S. 1011 (1993); United States v. Miller, 974 F.2d 953, 956 (8th Cir. 1992); United States v. Jones, 759 F.2d 633, 636 (8th Cir.), cert. denied, 474 U.S. 837 (1985). "A dual inquiry determines the reasonableness of an investigative stop: 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Doffin, 791 F.2d 118, 120 (8th Cir.), cert. denied, 479 U.S. 861 (1986)(quoting Terry v. Ohio, 392 U.S. 1, 19-20 (1968)).

The record in this case establishes that on October 27, 2009, officers responded to a call of a disturbance by a person who was in violation of an order of protection and believed to be high on PCP. (See Fact No. 1, supra) When the officers arrived at the scene, they were advised by a group of people standing outside the apartment complex that there was a black male dressed in all black who was not looking right, that is he appeared to be high on something and out of control. (Id.) As Officer Grizzoffi was conducting a quick scan of the area, he observed a black male wearing all black in a courtyard. (See Fact No. 2, supra) When Officer Grizzoffi attempted to make verbal contact with the party, the party (defendant Blackmon) turned, but just looked off into the distance. (Id.) Despite repeated commands by first Officer Grizzoffi and then by both Officer Grizzoffi and Officer Moore to get on the ground, Blackmon failed to comply or respond in any way to the officers. (Id.) Both Officers Grizzoffi and Moore testified that based on Blackmon's appearance and actions, they believed he was under the influence of PCP. (Id.)

Reasonable suspicion entails some minimal level of objective justification for making a stop–that is, something more than a suspicion or hunch. See United States v. Sokolow, 490 U.S. 1, 7

(1989); United States v. Delaney, 52 F.3d 182, 187 (8th Cir.), cert. denied, 516 U.S. 878 (1995). Based on the facts known to the officers at the time they stopped defendant Blackmon, the Court concludes that the officers had a reasonable, articulable suspicion that Blackmon may have been engaged in criminal activity and that the officers were justified in conducting an investigative stop of him. The officers were not acting on a mere hunch. They had been dispatched to 4016 East 56 Terrace to investigate a violation of an order of protection by a person believed to he high on PCP. When they arrived on the scene, bystanders provided a physical description of a person who appeared to be high on something and out of control. Officer Grizzoffi observed a person matching the description provided in the courtyard of the apartment complex to which he had been dispatched. Thus, the first part of the Terry inquiry shows that the investigative stop was justified under the circumstances.

As to the second part of the Terry inquiry, "a police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time." United States v. Seelye, 815 F.2d 48, 50 (8th Cir. 1987)(citing United States v. Jones, 759 F.2d 633, 636-37 (8th Cir.), cert. denied, 474 U.S. 837 (1985)). A police officer may conduct a patdown search of a suspect during an investigative stop if the officer has reason to believe that the person is armed and dangerous. See Terry v. Ohio, 392 U.S. 1, 7, 30 (1968)(officer grabbed suspect, spun him around and frisked for weapons). In conducting the investigative stop and checking for possible weapons, officers must employ the least intrusive means of detention reasonably necessary to achieve the purpose of the stop. See Florida v. Royer, 460 U.S. 491, 500 (1983); United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("a police officer's use of handcuffs can be a reasonable precaution during a Terry stop").

Here, the officers' actions were reasonable under the circumstances. As set forth above, both Officers Grizzoffi and Moore testified that based on defendant Blackmon's appearance and actions, they believed he was under the influence of PCP. (See Fact No. 2, supra) Blackmon did not respond

to the officers' repeated verbal commands. (See Fact Nos. 2 and 3, supra) Blackmon appeared to be ready to fight the officers and when he started to reach into his pockets, Officer Grizzoffi testified that he was concerned that Blackmon might be grabbing for a weapon. (See Fact No. 3, supra) Officer Moore testified that precautions need to be taken when dealing with parties under the influence of PCP because they can go from being incoherent to having super-human strength in a matter of seconds. (Id.) The taser appeared to have no effect on Blackmon, apparently because he could not feel it given the influence of the PCP. (Id.) After the third charge from the taser, Officer Grizzoffi was able to tackle Blackmon and both officers wrestled with Blackmon to get him handcuffed. (Id.) Cigarettes apparently dipped in PCP were found in the area where Blackmon fell down. (See Fact No. 5, supra) The Court finds that the officers' actions in tasing and tackling defendant were reasonably necessary to protect the officers' personal safety and to maintain the status quo so that the officers could determine whether Blackmon was engaged in criminal activity. See United States v. Foster, 376 F.3d 577, 587 (6th Cir.), cert. denied, 543 U.S. 1012 (2004)(officer did not exceed permissible bounds of Terry stop when he handcuffed suspect believed to be under the influence of PCP, knowing that individuals under the influence of PCP can quickly become extremely violent).

"In determining whether probable cause exists to make a warrantless arrest, the court looks to the totality of the circumstances to see whether a prudent person would believe the individual had committed or was committing a crime." United States v. Segars, 31 F.3d 655, 659 (8th Cir. 1994), cert. denied, 513 U.S. 1099 (1995)(citing Illinois v. Gates, 462 U.S. 213, 232-33 (1983)). Defendant Blackmon was arrested for violating the order of protection, for resisting arrest and for drug possession. (See Fact No. 7, supra) After Blackmon was taken into custody, the officers obtained a copy of the order of protection. (See Fact No. 6, supra) Officer Moore testified that the order of protection appeared to him to be in order. (Id.) The officers determined that Blackmon violated the order by entering Sherry Pulluaim's apartment while her son was there. (Id.) Defendant Blackmon did not follow the repeated verbal commands of the arresting officers and appeared to the officers

6

to be under the influence of PCP. (See Fact Nos. 2 and 3, supra) After Officer Grizzoffi tackled Blackmon and Officers Grizzoffi and Moore wrestled with Blackmon to get him handcuffed and into custody, the officers observed cigarettes that they believed to have been dipped in PCP around the area where Blackmon fell. (See Fact Nos. 3 and 5, supra) The Court finds that the officers were justified in arresting defendant Blackmon as they had probable cause to believe that Blackmon had committed a crime.

The subsequent search of defendant Blackmon's person which revealed a cough syrup bottle containing a brown liquid believed to be PCP, additional More cigarettes and a large amount of currency was permissible as a search incident to arrest. See United States v. Robinson, 414 U.S. 218, 235 (1973)("in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment").

## IV. CONCLUSION

Officers were justified in stopping defendant Blackmon for the purpose of investigating possible criminal behavior because the officers had an articulable and reasonable suspicion of criminal activity. The officers' actions in tasing and tackling defendant Blackmon were reasonably related to the circumstances which justified the stop and were necessary to protect the officers' personal safety. The arrest of defendant Blackmon was supported by probable cause. The subsequent search of defendant's person was permissible as a search incident to arrest. Given the Court's findings, the evidence obtained as a result of the stop and arrest of defendant Blackmon was not the product of an illegal search.

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant's Motion to Suppress Evidence (doc #20).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and

serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

<u>     /s/ Sarah W. Hays     </u>  
SARAH W. HAYS  
UNITED STATES MAGISTRATE JUDGE